IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DEEANN BARNES                                                              PLAINTIFF

V.                          NO. 2:16-cv-02156-PKH-MEF

NANCY A. BERRYHILL,
Acting Commissioner, Social Security Administration[1]              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Deeann Barnes, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under the provisions of Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.     Procedural Background:**

Plaintiff filed her application for SSI on September 30, 2013, alleging disability beginning May 1, 2013, due to left shoulder problems, mental problems, and Hepatitis B. (ECF No. 12, pp. 23, 166, 170). An administrative hearing was held on September 9, 2014, at which Plaintiff appeared with counsel and testified. (ECF No. 12, pp. 38-62).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On December 3, 2014, the ALJ entered an unfavorable decision denying Plaintiff's application for SSI. (ECF No. 12, pp. 20-33). In this decision, the ALJ found Plaintiff had not engaged in Substantial Gainful Activity ("SGA") since September 30, 2013, her application date. (ECF No. 12, p. 25, Finding 1). The ALJ determined Plaintiff had the following severe impairments: status-post left shoulder fracture and dislocation, with two open-reduction/internal fixation repairs; depression; anxiety; and, a history of drug abuse, currently in remission. (ECF No. 12, pp. 25-26, Finding 2). Despite being severe, the ALJ determined these impairments did not meet or medically equal the requirements of any of the Listings of Impairments in Appendix 1 to Subpart P of Part 404 ("Listings"). (ECF No. 12, pp. 26-27, Finding 3).

The ALJ then considered Plaintiff's Residual Functional Capacity ("RFC"). (ECF No. 12, pp. 27-32, Finding 4). First, the ALJ evaluated Plaintiff's subjective complaints and found her claimed limitations were not entirely credible. *Id.* Second, the ALJ determined Plaintiff retained the RFC to perform:

> light work as defined in 20 C.F.R. § 416.967(b), except that she can perform only occasional overhead reaching with her non-dominant, left upper extremity. [Plaintiff] has good use of her dominant, right upper extremity. Additionally, [Plaintiff] is limited to jobs involving simple tasks, simple instructions, and only incidental contact with the public.

*Id.* The ALJ determined Plaintiff had no Past Relevant Work ("PRW"). (ECF No. 12, p. 32, Finding 5). Based on Plaintiff's age, education, work experience, and RFC, the ALJ determined there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, such as a housekeeper, price marker, and inspector. (ECF No. 12, pp. 32-33, Finding 9). The ALJ, therefore, determined Plaintiff had not been under a disability, as defined by the Act, from September 30, 2013, Plaintiff's application date, through December 3, 2014, the date of the ALJ's decision. (ECF No. 12, p. 33, Finding 10).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied her request on June 14, 2016. (ECF No. 12, pp. 5-11). On July 5, 2016, Plaintiff filed the present appeal with this Court. (ECF No.1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (ECF Nos. 13, 14).

## II. Applicable Law:

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

3

techniques." 42 U.S.C. § 1382c(a)(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. 20 C.F.R. § 416.920(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920(a)(4)(v).

**III.     Discussion:**

Plaintiff argues a single issue in this appeal – that the ALJ erred as to Plaintiff's RFC. (ECF No. 13). RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen,* 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a

4

medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

    A.    **Physical RFC**

On June 12, 2013, Plaintiff was involved in a motorcycle accident and suffered acromioclavicular separation, commonly referred to as an AC joint tear. (ECF No. 12, pp. 318-41). Plaintiff was advised to ice her shoulder, wear a sling, was prescribed Vicodin for pain relief, and was given a referral to an orthopaedist. *Id.* Plaintiff followed up with her primary care physician at the time, Dr. Urban, on June 14, 2013. (ECF No. 12, pp. 238-40). Dr. Urban noted that she was taking Hydrocodone-Acetaminophen, Amoxicillin, and Prozac at the time of her visit. (ECF No. 12, p. 239). Dr. Urban scheduled Plaintiff for an appointment with a specialist at Mercy Hospital in Paris, Arkansas, but a notation on July 1, 2013 indicates Plaintiff did not attend the appointment. (ECF No. 12, p. 240).

Plaintiff eventually met with Dr. Ogg on August 20, 2013, on referral from Dr. Urban. (ECF No. 12, pp. 245-48). Dr. Ogg rated Plaintiff's injury as a grade three AC joint tear of the left shoulder and recommended surgical intervention. *Id.* Dr. Ogg conducted an outpatient acromial-clavicular reconstruction surgery procedure on August 22, 2013. (ECF No. 12, pp. 258-64). Plaintiff was discharged the same day with instructions to keep her shoulder in her sling and perform a set of exercises every day. (ECF No. 12, p. 263). She was also instructed to keep her activities of daily living "light" and was given a prescription for Lortab for pain. *Id.*

Plaintiff returned to Dr. Ogg for a one-week follow-up on August 30, 2013. (ECF No. 12, pp. 249-50). Plaintiff was healing well, and Dr. Ogg noted Plaintiff's grip strength was 5/5,

intrinsic strength 5/5, and EPL strength 5/5. (ECF No. 12, p. 249). Dr. Ogg ordered Plaintiff to continue using the sling, but stated Plaintiff "is to come out of the sling for gentle range of motion exercises, wall walking and range of motion." (ECF No. 12, p. 250). Plaintiff followed-up on September 6, 2013, and Dr. Ogg ordered Plaintiff to continue with her sling and exercises, but also noted that Plaintiff was not supposed to lift, push, pull, or engage in other strenuous activities with her left shoulder. (ECF No. 12, pp. 251-52).

During Plaintiff's six-week follow-up appointment on October 4, 2013, Dr. Ogg noted the fixation of Plaintiff's left shoulder had stretched out and that some superior displacement was still present. (ECF No. 12, pp. 253-55). Dr. Ogg recommended discontinuing use of the sling and increasing her activities of daily living and exercises. (ECF No. 12, p. 254). The October 4, 2013, visit is also when Dr. Ogg began providing specific commentary in his treatment notes regarding Plaintiff's use of narcotic pain medication. *Id.* Dr. Ogg stated, "I refilled her prescription for Hydrocodone. Her husband is requesting I write the prescription large enough so that he does not have to have it filled multiple times as there is a rather costly co-pay each time he has to pay for the prescription for her." *Id.*

Plaintiff returned to Dr. Ogg on November 1, 2013. (ECF No. 12, pp. 272-74). Dr. Ogg noted that Plaintiff "was originally not going to have time for her visit today but needed refills on her pain medicine but I insisted that she come in for an examination today so we can recheck her." (ECF No. 12, p. 271). New x-rays revealed Plaintiff's left shoulder had not healed properly after her first surgery. (ECF No. 12, pp. 272-73). Dr. Ogg recommended a second surgery to remove the Tight Rope implant from the first surgery and complete Plaintiff's AC joint repair with a Hook Plate device, which itself would require removal in the future. (ECF No. 12, p. 273). Plaintiff agreed, and Dr. Ogg performed the procedure on November 5, 2013. (ECF No. 12, pp. 265-71).

6

Plaintiff was discharged home on the same day with a prescription for Percocet for her pain and instructions to protect her arm with a sling, to engage only in gentle range of motion, and to avoid heavy lifting, pushing, or pulling. (ECF No. 12, p. 270).

Two weeks later, on November 19, 2013, Plaintiff returned for her follow-up with Dr. Ogg. (ECF No. 12, pp. 283-284). In his notes, Dr. Ogg recalled, "[Plaintiff] had phoned in last week after consuming 90 Percocet pain medications in the course of five days and also 90 of the Robaxin muscle relaxers. She was admonished about proper dosing of these medications and refills on her medications were withheld." *Id.* at 283. Nevertheless, Dr. Ogg refilled Plaintiff's prescription for Robaxin. *Id.* Six days later, on November 25, 2013, Dr. Ogg stated, [Plaintiff] phoned the office early this morning asking for more medications and stronger muscle relaxers. She explains that she fell last night. I asked [Plaintiff] to come back in the office because of such a string of remarkable bizarre accidents and tremendous narcotic use on her part after surgery." (ECF No. 12, p. 285). Dr. Ogg also noted that Plaintiff was not wearing her sling when she arrived for her appointment. *Id.* Plaintiff requested she be prescribed Diazepam, but Dr. Ogg prescribed Flexeril instead, "as I [Dr. Ogg] am afraid the Diazepam has just too much of an abuse potential for this patient." *Id.* at 286. Nevertheless, Dr. Ogg also refilled Plaintiff's Percocet prescription. *Id.*

On December 23, 2013, Dr. Ogg stated, "[t]he latest message from [Plaintiff's] boyfriend was that she did not start physical therapy because she needed more narcotics and since they were not even due to be refilled yet, we went ahead and asked [Plaintiff] to come in again to recheck." (ECF No. 12, p. 287). Dr. Ogg suggested Plaintiff's muscle spasm and low pain tolerance was potentially due to nerve pain so he started her on Neurontin. *Id.* at 288. He also indicated he was "weaning [Plaintiff] down" on narcotic pain medication and was prescribing smaller doses of Percocet. *Id.*

7

Plaintiff continued to follow-up with Dr. Ogg on January 22, 2014, and February 24, 2014, where they prepared for surgery to remove the Hook Plate device from Plaintiff's left shoulder. (ECF No. 12, pp. 289-90, 303-04). The administrative transcript does not include records of the procedure where Dr. Ogg removed the Hook Plate device, but Plaintiff followed-up with Dr. Ogg two weeks later on March 24, 2014. (ECF No. 12, pp. 305-07). Dr. Ogg reported as follows:

> This thirty-three-year-old female returns today two weeks out from hardware removal of left distal clavicle. She elected to take her own stitch out last week. She also volunteers that she was wearing a hand bag on her left shoulder and was on the back of a motorcycle and the driver apparently popped the clutch abruptly and as she described it, kills the motor, but she flew off the back of the motorcycle at the same time and fell on to her shoulder.

(ECF No. 12, p. 305). Plaintiff had now been thrown off the back of a motorcycle and onto her left shoulder twice in nine months. Dr. Ogg identified a new fracture of Plaintiff's left clavicle, but estimated it would heal on its own. *Id.* at 306.

Plaintiff followed-up with Dr. Ogg on April 28, 2014. (ECF No. 12, pp. 308-309). He noted Plaintiff was not wearing her sling when she arrived. *Id.* at 308. Upon physical examination of Plaintiff, Dr. Ogg found as follows:

> [Plaintiff's] surgical incision has healed and unremarkable. She still exhibits some apprehension and tenderness over the distal clavicle at the fracture site now but not really at the AC joint at all. She is able to abduct 150 degrees, forward flexion 160 degrees, external rotation 75 degrees, internal rotation T10. She has good range of motion. Neurovascularly intact in the upper extremity.
> . . .
>
> [Plaintiff] will continue to use the sling, avoid strenuous activities of the left shoulder. Refilled her prescription for the Percocet today. Follow up in four weeks for recheck. I again advised her about smoking cessation.

(ECF No. 12, pp. 308-09). According to the record, the April 28, 2014 appointment was Plaintiff's last meeting with Dr. Ogg. Despite other evidence in the record regarding treatment for Plaintiff's alleged mental health impairments through January 22, 2015, the record does not contain any

8

evidence Plaintiff sought further treatment for her alleged physical impairments after April 28, 2014.

Plaintiff's primary contention is that the pain Plaintiff experiences on a daily basis would result in limitation in the area of concentration, persistence, and pace. (ECF No. 13, p. 11). The ALJ, however, specifically examined the duration, frequency, and intensity of Plaintiff's alleged pain and determined her complaints were less than fully credible. (ECF No. 12, pp. 29-30). An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them; however, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v.* Colvin, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007)). The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ considered Plaintiff's allegations of disabling pain associated with all her alleged physical impairments. For example, the ALJ considered Plaintiff's alleged back and hip pain. (ECF No. 12, p. 29). He noted, "there is no clinical support for her claims of debilitating back and hip pain — a fact that suggests she might be attempting to exaggerate her symptoms." *Id.* He discussed Plaintiff's shoulder injuries at length and summarized the medical evidence in the record. *Id.* He noted that Plaintiff's testimony was inconsistent with the objective evidence in the record. *Id.* For example, despite Plaintiff's testimony she was unable to use her left arm for anything but the most basic functions, records from Dr. Ogg consistently showed good range of motion and strength. *Id.* Dr. Ogg did not even believe Plaintiff would need physical therapy to regain full function if Plaintiff patiently allowed her shoulder to heal and adhered to Dr. Ogg's recommendations for use of an arm sling and exercises. *Id.* at 29, 288. Plaintiff also testified that

she was not taking any pain medication at the time of the hearing and had stopped treatment with Dr. Ogg because he wanted to perform another surgery, which she would not agree to. (ECF No. 12, p. 57). Dr. Ogg's treatment notes, including those from his last meeting with Plaintiff on April 28, 2014, do not indicate Dr. Ogg recommended any further surgery. (ECF No. 12, pp. 308-09). Moreover, Plaintiff's use of over-the-counter Ibuprofen for pain management at the time of the hearing belies her claims of disabling pain.

The ALJ also discussed how Plaintiff's history of drug abuse factored into his decision. (ECF No. 12, p. 30). The ALJ credited Plaintiff's testimony that Plaintiff's drug abuse was in remission. *Id.* But, the ALJ remarked in his decision, "[Plaintiff's] addictive behavior seems to have played a role in her reported pain symptoms." *Id.* After summarizing the evidence of Plaintiff's narcotic pain medication use, the ALJ stated that, "[n]one of this evidence aids [Plaintiff's] testimony that she suffers from disabling shoulder pain." *Id.* Plaintiff's misuse of medications is a valid factor in the ALJ's credibility determination. *See Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995) (observing that a claimant's "drug-seeking behavior further discredits her allegations of disabling pain"); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) ("[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations.").

Although it is clear that Plaintiff suffers with some degree of limitation, Plaintiff has not established that she is unable to engage in any gainful activity, or that she was more limited than her RFC to perform light work with only occasional overhead reaching with her left upper extremity. Accordingly, the Court concludes that the ALJ provided good reasons for discounting Plaintiff's subjective complaints, and that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints where not entirely credible. Further, based on the record as a

whole, the Court finds the portion of the ALJ's RFC determination concerning Plaintiff's physical limitations is supported by substantial evidence.

   B.   **Mental RFC**

Plaintiff established care with Dr. Urban on October 12, 2012. (ECF No. 12, pp. 242-44). Dr. Urban began treating Plaintiff for insomnia (with Trazodone) and for depression and anxiety (with Fluoxetine). *Id.* The record indicates, however, that Plaintiff did not return to Dr. Urban complaining of mental health impairments until September 23, 2013. (ECF No. 12, pp. 241-42).

One month prior to Plaintiff's return to Dr. Urban, Plaintiff was hospitalized for homicidal ideation. (ECF No. 12, pp. 342-75, 384-401). Plaintiff presented to Mercy Hospital in Paris, Arkansas on August 1, 2013, and complained of invasive thoughts of "wanting to hurt or kill someone," for the previous three to four months. (ECF No. 12, p. 348). Plaintiff's urine drug screen showed a presumptive positive result for cannabinoids, methamphetamine, amphetamines, benzodiazepine, and barbiturates. (ECF No. 12, p. 350). Treatment notes indicate as follows:

> Her affect is labile and inappropriate. Her speech is rapid and/or pressured. She is agitated, aggressive and hyperactive. Thought content is delusional. She expresses impulsivity and inappropriate judgment. She expresses homicidal and suicidal ideation. She expresses homicidal plans.

(ECF No. 12, p. 350). Plaintiff reportedly stated: "I am having homicidal thoughts and need help. I want to cut their guts out shove them down their throat. I have had problems since I was 13 with wanting to hurt others, but since my son's dad died in May, 2013 it has been worse." (ECF No. 12, p. 352). Plaintiff admitted possession of a knife, which she voluntarily surrendered to hospital staff and was later released to her friend, "Skeeter." (ECF No. 12, pp. 352-53). Plaintiff was diagnosed with drug abuse and dependence and homicidal ideation, and she was transferred to the care of UAMS Medical Center ("UAMS"). (ECF No. 12, pp. 352, 355).

Plaintiff was treated by UAMS from August 1, 2013 to August 6, 2013. (ECF No. 12, pp. 384-401). On admission, Plaintiff was diagnosed with mood disorder not otherwise specified, rule out bipolar disorder, methamphetamine abuse, cannabis abuse, alcohol abuse, borderline personality disorder, rule out antisocial personality disorder, and was assigned a Global Assessment of Functioning ("GAF") score of 30. (ECF No. 12, p. 393). Upon discharge on August 6, 2013, Plaintiff was diagnosed with bipolar disorder, methamphetamine abuse, cannabis abuse, and alcohol abuse, and was assigned a Global Assessment of Functioning ("GAF") score of 51-60. (ECF No. 12, p. 384). She was discharged in stable condition with no restrictions and was given prescriptions for Trazodone and Depakote. (ECF No. 12, p. 386).

When Plaintiff followed-up with Dr. Urban on September 23, 2013, she reported that Depakote was not helping and that she was taking double doses of Trazadone with no improvement. (ECF No. 12, pp. 237-38). Dr. Urban changed Plaintiff's medication to Effexor and Vistaril. *Id.* Plaintiff met with Dr. Urban one more time, on October 24, 2013, for refills, but otherwise did not seek treatment from Dr. Urban again. (ECF No. 12, pp. 236-37). Plaintiff did not seek treatment for her alleged mental health impairments again until April 4, 2014, when she established care with Dr. Bell. (ECF No. 12, p. 316). The record indicates Plaintiff decided to switch from seeing Dr. Urban to seeing Dr. Bell because of location. *Id.* Dr. Bell diagnosed Plaintiff with major depression and insomnia, and Abilify and Trazodone were prescribed. *Id.* Plaintiff only visited with Dr. Bell one more time, on April 17, 2014, and she was referred to Dr. Chambers. (ECF No. 12, pp. 314-15).

The record contains evidence of nine appointments between Plaintiff and Dr. Chambers. (ECF No. 12, pp. 295-300, 423-28). Plaintiff established care with Dr. Chambers on April 21, 2014. (ECF No. 12, p. 295). Dr. Chambers prescribed Trileptal. *Id.* He also stated, "I talked to

her about neurofeedback but she is Medicaid and has really used all of her visits already. It is going to be difficult to get her treated." *Id.* The treatment notes for the appointment dates that follow all indicate Dr. Chambers frequently adjusted Plaintiff's medication, but they do not include any other information regarding Plaintiff's treatment, if she was receiving counseling, her subjective review of symptoms, Dr. Chamber's own objective examinations of Plaintiff, or any recommendations Dr. Chambers may have made aside from prescription management. On April 30, 2014, Dr. Chambers took Plaintiff off Trileptal and started her on Zonogran. (ECF No. 12, p. 296). Dr. Chambers took Plaintiff off Zonogram on May 14, 2014. (ECF No. 12, p. 297). He indicated Plaintiff was continuing to take Abilify, Ativan, Trazodone, and Effexor, but he declined to prescribe a mood stabilizer. *Id.* On May 21, 2014, Dr. Chambers increased Plaintiff's dose of Ativan, took her off Effexor, and started her on Brintellix. (ECF No. 12, p. 298). Dr. Chambers increased Plaintiff's Brintellix dose on June 4, 2014. (ECF No. 12, p. 300).

On August 4, 2014, Dr. Chambers described Plaintiff as "pretty stable." (ECF No. 12, p. 423). He stopped her Ativan and started her on Klonopin at her request. *Id.* At some point, Plaintiff stopped taking Brintellix, and Dr. Chambers began giving Plaintiff samples to get her back on the medication before ramping up the dose later. *Id.* Dr. Chambers' treatment notes from September 8, 2014, state as follows:

> She brings in paperwork about disability. She was abused as a child. She is hyper-aroused, over-keyed up, sensitive to provocation, mad all of the time, periodic mood changes and is over anxious. We are having to give her Celexa instead of Brintellix, which was working well, because of insurance. But she is not doing that badly. We are going to try 40 of Celexa and I want to see her back in a month.

(ECF No. 12, p. 424). Dr. Chambers again indicated on October 6, 2014, that Celexa was not as effective as Brintellix for Plaintiff, but despite Medicaid not paying for Brintellix, Dr. Chambers would get Plaintiff back on the medication. (ECF No. 12, p. 425). Dr. Chambers provided Plaintiff

13

more Brintellix samples on October 27, 2014. (ECF No. 12, p. 426). Plaintiff did not return to Dr. Chambers until January 22, 2015, whereupon Dr. Chambers stressed to Plaintiff she needed to find a way to get the medication without Dr. Chambers continuously supplying Plaintiff with samples. (ECF No. 12, p. 428). Dr. Chambers stated Plaintiff was doing "very well" on Brintellix and scheduled her next follow-up appointment for three months in the future. *Id.*

Plaintiff primarily contends her alleged mental impairments would result in limitation in the area of concentration, persistence, and pace. (ECF No. 13, p. 12). The ALJ determined Plaintiff suffered only moderate difficulties with regard to her concentration, persistence, and pace. (ECF No. 12, p. 27). In this regard, the ALJ gave partial weight to the medical opinions in the record.

Dr. Efird performed a Mental Diagnostic Evaluation on January 10, 2014. (ECF No. 12, pp. 278-81). Dr. Efird diagnosed Plaintiff with moderate major depressive disorder, generalized anxiety disorder, and assigned Plaintiff a GAF score of 53-63. (ECF No. 12, p. 280). Dr. Efird determined Plaintiff "has the capacity to perform basic cognitive tasks required for basic work like activities," and "[n]o remarkable problems with persistence were noted during this evaluation." (ECF No. 12, p. 281). Dr. Efird further opined that Plaintiff "appears to be capable of performing basic work like tasks within a reasonable time frame." *Id.* The ALJ gave Dr. Efird's opinion, as well as the opinions of the non-examining state agency consultants, "partial weight . . . due to their consistency with mental-status test results indicating that [Plaintiff's] thought processes are logical and coherent, that she can follow simple instructions, and that she can persist at simple tasks." (ECF No. 12, p. 31). He limited the weight he gave their opinions, however, because he determined Plaintiff suffered moderate limitation in the area of social functioning, "such that she should avoid extensive contact with the public." *Id.*

14

A Mental RFC Questionnaire was completed by Dr. Chambers on September 9, 2014. (ECF No. 12, pp. 378-382). Dr. Chambers opined Plaintiff suffered "serious" limitation in numerous domains, and that Plaintiff's ability in nearly every other domain was "less than satisfactory, but not precluded in all circumstances." (ECF No. 12, pp. 380-81). The ALJ also gave Dr. Chambers' opinion partial weight, "because it is supported by evidence demonstrating that [Plaintiff's] intellectual functioning is at the low-average range, and that she has interacted appropriately in examinations." (ECF No. 12, pp. 31-32). The ALJ limited the weight given to Dr. Chambers' opinion, however, because Plaintiff's mental health treatment record was sparse, because Plaintiff's psychological presentation at her appointments was unremarkable, and because the record does not support Dr. Chambers' assertion Plaintiff would require additional work absences. *Id.* Indeed, Dr. Chambers' own treatment notes do not contain any evidence he employed any medically acceptable clinical or laboratory diagnostic techniques. Rather, Dr. Chambers regularly adjusted Plaintiff's medication based on her own subjective complaints and feedback regarding her medication effectiveness.

As we have frequently noted, "treating physician opinions may receive limited weight if they are conclusory or inconsistent with the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016). The ALJ may afford a treating source's opinion "controlling weight" if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record.*" *Wagner v. Astrue*, 499 F.3d 842, 848–49 (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)). "[W]hile a treating physician's opinion is generally entitled to 'substantial weight,' such an opinion does not 'automatically control' because the hearing examiner must evaluate the record as a whole." *Id.* at 849 (quoting *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999)). When a treating physician's

opinion is in conflict with other substantial medical evidence, then the ALJ may afford less weight to that physician's opinion. *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013–14 (8th Cir. 2000)). In the present case, the ALJ was permitted to give Dr. Chambers' opinion less than controlling weight because it was inconsistent with the record as a whole which lacked support for the assertion she would require additional work absences and showed that, aside from Plaintiff's acute hospitalization in August of 2013, Plaintiff's mental health treatment record was sparse and her psychological presentation at her appointments was unremarkable. *See Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005) ("While the ALJ also found Dr. Prihoda's opinion to be internally inconsistent, we need not comment on that, as an appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").

The Court notes that in determining Plaintiff's RFC, the ALJ considered the treatment notes and medical opinions of the treating physicians, and specialists, as well as those of the non-examining state agency consultants, and the ALJ set forth the reasons for the weight given to the opinions. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians") (citations omitted); *Prosch v. Apfel,* 201 F.3d 1010 at 1012 (8th Cir. 2000) (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

The undersigned concludes that the ALJ's RFC determination is consistent with the weight given to the medical opinions. Based on examination of the record as a whole, the undersigned finds that the portion of the ALJ's RFC determination concerning Plaintiff's mental limitations is supported by substantial evidence.

### C. Financial Hardship

Plaintiff argues briefly that her financial hardship was a substantial barrier to her treatment. (ECF No. 13, p. 12). The Court notes, however, that Plaintiff has not submitted any evidence indicating she sought access to, and was denied, low cost or free healthcare services, which is generally inconsistent with Plaintiff's claims of disabling symptoms. *See Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992). On the contrary, when Dr. Chambers discovered Brintellix was effective in treating Plaintiff's alleged mental impairments, he went to great lengths to supply Plaintiff with free samples. (ECF No. 12, p. 425).

### IV. Conclusion:

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of June, 2017.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE